William BORING, Claimant–Respondent,

v.

TREASURER OF MISSOURI, CUSTODIAN OF THE SECOND INJURY FUND, Respondent–Appellant.

No. 71074.

Missouri Court of Appeals, Eastern District, Division Four.

June 17, 1997.

Jeremiah W. (Jay) Nixon, Attorney General, Scott R. Poll, Assistant Attorney General, Jefferson City, for Appellant.

Robert H. Sihnhold, St. Louis, for Respondent.

KAROHL, Judge.

The Second Injury Fund (Fund) appeals a Labor and Industrial Relations Commission Award of permanent disability compensation for William Boring (claimant). We affirm.

On October 30, 1991, claimant, a licensed practical nurse, was working for Levering Home. On that day, he was lifting a 250 pound patient out of bed when he felt his back "give". He immediately felt pain in his back, his left thoracic area, rear thoracic area, groin, right testicle, and down his legs. On February 28, 1992, claimant had back surgery. He was, and is, incapable of performing prescribed back exercises because of his difficulty with breathing associated with chronic obstructive pulmonary disease (COPD).

Claimant settled his claim against Levering Home "for permanent partial disability of 27 1/2% of the body as a whole referable to the low back." Claimant receives Social Security disability payments for total disability.

Prior to the compensable back injury, claimant had suffered several unrelated injuries. He broke a toe in "the early '70s" while on the job and "in cold weather temperatures, ... the pain is intense." He suffered rheumatic fever as a child but "[e]ventually, [he] outgrew it...." In 1981 or 1982, while working at a diecasting company, he was diagnosed with COPD and a 40% blockage in one of his lower coronary arteries. He underwent a cardiac catheterization procedure at the time. Twelve weeks after the surgery he returned to his job, but he reexperienced the same problems and was readmitted to a hospital. Since the surgery, he has had shortness of breath and occasional chest pains. When he returned to work, he was transferred to another division. Claimant continued to have pain and shortness of breath. He eventually had to quit that job.

On Memorial Day of 1970, a car fell on claimant's head. It fractured his skull in three places. He received emergency surgery to stop some internal bleeding. His left cheekbone was fractured and treated surgically. He also received eye surgery twice to correct double vision. As a result of these injuries, claimant has had "terrible headaches constantly. They are getting more severe." He also has no sense of taste or smell.

In 1990, claimant was employed as a licensed practical nurse at Levering Home. He periodically missed a day or two of work because of his headaches and vision problems.

Claimant injured his left shoulder in 1985, and continues to have pain down to the elbow. He experiences popping, grating and clicking when he moves his shoulder.

Claimant testified his previous conditions hindered his work at Levering Home prior to his October 30, 1991 back injury. He had difficulty walking up flights of stairs, reading prescriptions for patients, and lifting patients.

A couple of days after the October 30, 1991 back injury, claimant returned to work, performing "nonlifting functions and responsibilities...." In November 1991, Levering Home fired claimant because of his "hostile attitude." After his back surgery, he called another nursing home about the possibility of work. He was turned down because of his inability to lift.

Since the surgery, claimant has been "in pain twenty-four hours a day...." He has received no beneficial effect from any of the treatments. Prior to his injury he had no difficulty kneeling, stooping, crouching or getting up; he could "polka with the best of them." Prior to the accident, claimant was on no restrictions from any doctor.

Claimant's back problems prevent him from doing even office work because he is in constant pain. His breathing problems prevent him from doing back exercises that were prescribed to lessen the back pain. All of his symptoms and problems physically play on each other, affect each other.

In 1985 claimant's doctor advised him to stop smoking cigarettes. Other doctors have also advised him to stop smoking. He repeatedly and vehemently refused to quit smoking, both before and after the October 30, 1991 back injury.

The deposition testimony of Dr. David Volarich D.O. was admitted into evidence. Dr.

Volarich prepared a report dated April 27, 1994 based on his examination of claimant and of claimant's previous medical records. He concluded that claimant's overall disability was greater than the individual disabilities of particular portions of his body. Dr. Volarich testified claimant had several medical problems because of his COPD.

> [Claimant] cannot properly take in enough oxygen and get rid of the waste products of carbon dioxide and other materials because of the compromise in the pulmonary system. The chest demonstrates advanced changes now with increased AP diameter, which is the barrel chest as seen in chronic lung disease. He has diminished breath sounds. He has a significant cough and sputum production. All of those limit endurance and create more medical problems with risk factors for other body systems.

Dr. Volarich testified claimant's COPD hinders him in his employment or reemployment. He recommended in his report that claimant

> continue to attempt to maintain as much active motion and range of motion as possible in his spine and peripheral skeleton. He should pursue a non-impact exercise program and limit this to walking only. He should avoid fixed positions for any longer than 15–20 minutes and he should avoid all repetitive activities regarding the low back. I would recommend he lift no more than 15 pounds on an occasional basis. He should avoid all stooping, squatting, lifting, pushing, pulling, twisting, bending and other similar motions in the low back.

At the time Dr. Volarich examined claimant, claimant was smoking between two and three packs of cigarettes per day. Dr. Volarich recommended cessation of smoking, because "[s]moking is a significant health risk from multiple different body systems, whether it's heart, lung, a cancer risk, risk of developing degenerative disk disease and so forth." He testified claimant's COPD will continue to worsen if he continues to smoke. Also, "based on recent studies and research it appears that smokers have a higher incidence of degenerative disk disease and with

that the disk is more prone to damage, specifically herniation."

In his April 27, 1994 report, Dr. Volarich observed, "[i]n the mid–1980s, Mr. Boring was diagnosed with chronic obstructive pulmonary disease in the form of chronic bronchitis. He has smok[ed] 2–3 packs of cigarettes a day for 36 years."

Among his conclusions, Dr. Volarich found:

1. ... a 20% permanent partial disability of the body as a whole, as rated at the face, due to the multiple skull fractures, facial fractures and surgical repairs. ...

2. ... a 5% permanent partial disability of the left foot, due to the prior left toe fracture, ....

3. ... a 20% permanent partial disability of the body as a whole, as rated at the pulmonary system, due to the patient's chronic obstructive pulmonary disease in the form of chronic bronchitis, ....

4. Permanent disabilities from the prior left forearm fracture, right inguinal hernia, single vessel coronary artery disease, peptic ulcer disease and cervical degenerative arthritis are not identified today since the patient is asymptomatic in these areas.

He also concluded, "[t]he combination of impairments creates a greater disability than the simple total of each, and a 20% loading factor should be added."

In his report, Dr. Volarich recommended to claimant "again to stop smoking cigarettes. He is reluctant to stop smoking at this time, and his COPD will only worsen." He also suggested "that vocational rehabilitation evaluation be considered to determine if this gentleman can return to the labor market based on his physical disabilities, intellect and previous job experience."

The deposition testimony of James M. England, Jr., a rehabilitation counselor, was also admitted into evidence. England testified that

> prior to his injury Mr. Boring, I think, would—would have been highly marketable. ... But I think that, you know, just looking at the functional limitations both described by Doctor Volarich as well as the

restrictions described by Mr. Boring, you know, you've got a person who's basically functioning I think at what I would call less than a sedentary level of exertion. Just even to handle sedentary work you still have to be able to be there every day, function without lying down frequently, pay attention to what you are doing, concentrate. I think with this man's problems even though he's got the education and— and some good skills, he's just not, you know, a person his age who's walking with a cane, who has all the different problems that he has, I don't believe would really be able to compete, or to hold any type of employment that I know of that's out there in the world of work.

On July 19, 1996 the Labor and Industrial Relations Commission (Commission) affirmed an award of an Administrative Law Judge (ALJ) of permanent disability compensation from the Second Injury Fund. The Commission incorporated the January 16, 1996 award of the administrative law judge by reference.

The Fund asserts two points on appeal. In its first point, it argues:

**THE COMMISSION ERRED IN FINDING THAT SECTIONS 287.120(3) AND 287.140(5) DO NOT APPLY IN CASES INVOLVING THE SECOND INJURY FUND BECAUSE THE PLAIN AND ORDINARY LANGUAGE OF THESE STATUTES IS UNAMBIGUOUS, THE STATUTES ARE CAPABLE OF ONLY ONE CONSTRUCTION, AND THE PURPOSE OF THE STATUTE IS SERVED ONLY WHEN IT IS ALSO APPLIED TO THE SECOND INJURY FUND.**

The Fund argues that claimant's refusal to follow medical advice to quit smoking makes claimant's conditions non-compensable under § 287.140.5 RSMo 1994 [1], and that claimant's COPD was "self-inflicted" due to smoking, and therefore non-compensable under § 287.120.3.

Section 287.120.3 states:

No compensation shall be allowed under this chapter for the injury or death due to the employee's intentional self-inflicted in-

jury, but the burden of proof of intentional self-inflicted injury shall be on the employer or the person contesting the claim for allowance.

Section 287.140.5 states, in pertinent part:

No compensation shall be payable for the death or disability of an employee, if and insofar as the death or disability may be caused, continued or aggravated by any unreasonable refusal to submit to any medical or surgical treatment or operation, the risk of which is, in the opinion of the division or the commission, inconsiderable in view of the seriousness of the injury.

Claimant argues § 287.120.3 does not apply to compensation paid by the Fund because the subject of that section is "Liability of employer" and the Fund is not an employer. The Fund counters that subsection 3 places the burden of proof of intentional self-inflicted injury on "the employer *or the person* contesting the claim for allowance." (Our emphasis). The Fund argues it is a "person" contesting a claim for allowance. The only other party beside an employer or insurer who could contest a claim for allowance of worker compensation is the Fund. It concludes § 287.120.3 does apply to claims against the Fund.

The Fund argues § 287.140.5 applies to claims against it because it states in clear and unambiguous language, *"No compensation* shall be payable for the death or disability of an employee,...." (Our emphasis). It further argues neither section contains an express exemption for claims against the Fund. It points to § 287.210.7 as an example where the legislature specifically exempted claims against the Fund from a requirement that treating or examining physician reports be submitted into evidence if specific requirements are met: "The provisions of this subsection shall not apply to claims against the second injury fund." No exclusion appears in the two sections under review.

■ Assuming without deciding, §§ 287.120.3 and 287.140.5 apply to claims against the Fund, its point is without merit. Section 287.220 governs the Fund. It provides for Fund liability for *all* preexisting

---

1. References to the statutes are RSMo 1994 unless otherwise noted.

injuries regardless of their causes. Section 287.220.1 in pertinent part provides:

> All cases of permanent disability where there has been previous disability shall be compensated as herein provided. Compensation shall be computed on the basis of the average earnings at the time of the last injury. If any employee who has a *preexisting* permanent partial disability *whether from compensable injury or otherwise*, of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed, ... the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting disability. After the compensation liability of the employer for the last injury, considered alone, has been determined ... the degree or percentage of employee's disability that is attributable to *all* injuries or conditions existing at the time the last injury was sustained shall then be determined ... and the degree or percentage of disability which existed prior to the last injury plus the disability resulting from the last injury, if any, considered alone, shall be deducted from the combined disability, and compensation for the balance, if any, shall be paid out of ... the second injury fund, .... (Our emphasis).

Compensating a claimant for a self-caused preexisting injury is in accord with the two purposes of the Second Injury Fund: to encourage the employment of individuals who are already disabled; and, to relieve an employer or his insurer of liability for the previously disabled employee's total and permanent disability where that disability is not specifically attributable to an injury suffered during the period of employment with that employer. *See Lawrence v. Joplin R–VIII School Dist.*, 834 S.W.2d 789, 793 (Mo.App. S.D.1992). The cause of the preexisting condition is not a relevant consideration in accomplishing these purposes. Many injuries *during* childhood may be self-inflicted. The statute does not exclude such injuries when determining Second Injury Fund liability.

■ The Fund did not raise an affirmative defense in its answer, nor did it present *any* evidence at the hearing. At the close of claimant's evidence, the Fund stated it "does not call any witnesses and does not have any exhibits to produce and, therefore, rests." It did not attempt to prove claimant's smoking *after* the back injury was the present cause of permanent and total disability. Pursuant to § 287.120.3, the Fund has the burden of proving that claimant's continued smoking is a self-inflicted injury. The prohibition of paying compensation under § 287.140.5 for injuries of an employee, if and insofar as the injury "may be caused, continued or aggravated by any unreasonable refusal to submit to any medical or surgical treatment or operation," is an affirmative defense, with the burden on the party contesting the claim. *Jacobs v. Ryder System/Complete Auto Tr.*, 789 S.W.2d 233, 235 (Mo.App.1990).

The only evidence before the ALJ or the Commission concerning the effects of claimant's continued smoking, is that it would only *worsen* his COPD. No evidence was offered to support a finding claimant's COPD condition would improve if he stopped smoking or that his condition at the time of the hearing was different than at the time of the back injury. Therefore, there was no evidence to support a finding of post-accident self-inflicted injury. The ALJ and the Commission are instructed to consider the "degree or percentage of employee's disability that is attributable to all injuries or conditions *existing at the time the last injury was sustained* ...." (Our emphasis). Section 287.220.1. We have refused to expand § 287.220.1 to impose liability for any worsening of a claimant's preexisting disability occurring after the last injury was sustained without regard to whether the last injury contributed to or aggravated the preexisting injury.

It would be speculative to conclude the ALJ or the Commission awarded the claimant any compensation for any such worsening of his preexisting conditions. Dr. Volarich concluded from the results of his examination of claimant, claimant's history and a review of claimant's medical records that claimant had "a 20% permanent partial disability of the body as a whole, as rated at the pulmo-

nary system, due to the patient's chronic obstructive pulmonary disease in the form of chronic bronchitis," and that "[t]he combination of impairments creates a greater disability than the simple total of each, and a 20% loading factor should be added." This testimony, along with the testimony of England and claimant's *prior* medical records support the ALJ and Commission's finding that "Claimant's back injury of October 30, 1991, combined with his *previous* disabilities of COPD and coronary artery disease, result in Claimant's permanent and total disability as of November 13, 1991." (Our emphasis). Point denied.

■ The Fund also argues the Commission erred in awarding permanent total disability from the Fund because there was no sufficient, competent evidence to support the award and the award is contrary to the overwhelming weight of evidence because claimant's prior disability and the last injury do not together result in permanent total disability.

■ In reviewing a workers' compensation case, our duty is to determine whether the Commission's award is supported by competent and substantial evidence upon the whole record. *Garcia v. St. Louis County,* 916 S.W.2d 263, 266 (Mo.App. E.D.1995). We may not substitute our own judgment on the evidence for that of the Commission. *Id.* We must decide whether the Commission could have reasonably made its findings and award, upon consideration of all of the evidence before it. *Id.* To resolve the issue of reasonableness of the findings and award, we use a two-step procedure. *Id.* First, we examine the record, together with all reasonable inferences to be drawn from the evidence therein, in the light most favorable to the findings and award of the Commission to determine whether they are supported by competent and substantial evidence. *Id.* Second, we determine whether the Commission's findings and award, even if supported by some competent, substantial evidence, were nevertheless clearly contrary to the overwhelming weight of the evidence contained in the whole record before the Commission. *Id.*

■ In computing permanent and total disability in the situation where claimant suffers from a previous disability, the ALJ or Commission first determines the degree of disability as a result of the last injury. *Id.* The ALJ or the Commission then determines "the degree or percentage of employee's disability that is attributable to *all injuries or conditions existing at the time the last injury was sustained* . . . ." Section 287.220.1. (Our emphasis).

Substantial and competent evidence was presented to support the Commission's findings that,

> [i]t is clear from the medical records, the testimony of Dr. Volarich, the testimony of Mr. England and from the Claimant himself that he is permanently and totally disabled.
>
> . . . .
>
> The combination of his serious back injury, in combination with his advanced chronic obstructive pulmonary disease (COPD) and coronary artery diseases cause him to function at "less than a sedentary level".
>
> . . . .
>
> [T]he only expert testimony as to the cause of Claimant's total disability was that it was the result of the *combination* of the October 1991 back injury and the prior injuries and conditions. Dr. Volarich testified that Claimant could not work *as an LPN* as a result of the back injury alone, but that does not necessarily preclude all employment. A fair review of *all* the evidence leads to the inescapable conclusion that the back injury alone, while quite serious, would still have left Claimant a significant window of opportunity at reemployment, but that the COPD and coronary artery disease have completely foreclosed any reemployment opportunities.

Examining the record in the light most favorable to the Commission's findings and award, we conclude they are supported by competent and substantial evidence.

■ The evidence supports a finding that claimant's last injury did not, alone, permanently and totally disable him and that it was a *combination* of claimant's previous disabilities with the last injury that permanently

and totally disabled him. The test for permanent total disability is a claimant's ability to compete in the open labor market. *Searcy v. McDonnell Douglas Aircraft Co.*, 894 S.W.2d 173, 178 (Mo.App. E.D.1995). The Commission's finding that claimant's October 30, 1991 last injury did not, alone but only in combination with his previous disabilities, prevent him from competing in the open labor market is supported by the testimony of Dr. Volarich, Mr. England and the claimant, himself.

Dr. Volarich testified that claimant's overall disability is greater than his individual disabilities to the particular portions of his body. He also recommended in his report that claimant "continue to attempt to maintain as much active motion and range of motion as possible in his spine and peripheral skeleton. He should pursue a non-impact exercise program and limit this to walking only." He also suggested "that vocational rehabilitation evaluation be considered to determine if this gentleman can return to the labor market based on his physical disabilities, intellect and previous job experience."

Mr. England, a vocational specialist, in his deposition testified that claimant could not compete on the open labor market because of a combination of all of his physical infirmities, including the fact claimant cannot walk any distances without shortness of breath. He also testified that claimant's ability to exercise to improve his back condition would be limited by his breathing problems. In his report, Mr. England noted that "[claimant] is out of breath after walking 200 feet or climbing upstairs to his bed." Mr. England also noted "Mr. Boring has described his efforts to relieve pain as a cycle of brief activity with increase of pain which he attempts to control through medication, lying in a fetal position, and eventual sleep." Mr. England concluded

that unless his symptoms can be substantially relieved, his current level of functioning from a vocational standpoint would not allow him to compete on the open labor market. No reasonable employer could be expected to hire Mr. Boring and allow accommodations consistent with his symptoms and restrictions from physical activities.

Claimant testified that his back problems prevent him from doing even office work because he is in constant pain and his breathing problems prevent him from doing the back exercises that were prescribed to lessen the back pain. He testified that all of his symptoms and problems physically play on each other, affect each other. There is substantial and competent evidence to support the finding that the back injury, alone, was not permanently and totally disabling, but rather resulted in a permanent partial disability of 27.5% of the body as a whole. The Fund presented no evidence of its own. The findings were not contrary to the overwhelming weight of the evidence. Point denied.

We affirm.

RHODES RUSSELL, P.J. and SIMON, J., concur.